# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00556-COA

BRANDON DEWAYNE CHAMBLEE A/K/A                    APPELLANT
BRANDON WAYNE CHAMBLEE A/K/A
BRANDON CHAMBLEE

v.

STATE OF MISSISSIPPI                    APPELLEE

DATE OF JUDGMENT:                    01/26/2024
TRIAL JUDGE:                    HON. CALEB ELIAS MAY
COURT FROM WHICH APPEALED:          LEAKE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:             OFFICE OF STATE PUBLIC DEFENDER
                                    BY:  GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:              OFFICE OF THE ATTORNEY GENERAL
                                    BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:                  STEVEN SIMEON KILGORE
NATURE OF THE CASE:                 CRIMINAL - FELONY
DISPOSITION:                        AFFIRMED - 12/09/2025
MOTION FOR REHEARING FILED:

### BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     A Leake County jury convicted Brandon Chamblee of one count of gratification of lust for inappropriately touching a minor child, and the circuit court sentenced Chamblee to fifteen years in the custody of the Mississippi Department of Corrections (MDOC), with three years suspended and twelve years to serve without parole eligibility, followed by three years of post-release supervision.  Chamblee appeals, arguing that the circuit court erred in denying his motion to change venue, in not declaring a mistrial, and in excluding evidence. Chamblee further contends that the verdict was contrary to the overwhelming weight of the

evidence.  Having reviewed the record, the arguments of counsel, and relevant precedent, we affirm Chamblee's conviction and sentence.

**Facts and Procedural History**

¶2.    Chamblee and his wife, Leslie, married in 2014 and lived in Leake County, Mississippi, with Leslie's children from a previous marriage, a son and younger twin daughters, Melanie and Maggie.[1]  Between 2015 and 2016, Chamblee was jailed on an unrelated crime, and after his release, he resumed life with his family, now in Madden, Mississippi.  In September or October of 2021, Leslie and Chamblee signed papers to have him adopt the children and change their surnames to his.  The girls said they liked Chamblee more than their own father.  The family went to church together, and Chamblee sponsored a youth softball team.

¶3.    However, on February 11, 2022, the Leake County Child Protection Services (CPS) received an anonymous report that Chamblee had molested his stepdaughters.  After an initial screening, CPS scheduled the girls for more in-depth interviews with licensed social workers at the Mississippi Children's Advocacy Center in Pearl, Mississippi.  During these interviews held on February 28, 2022, Maggie, who was age 12 at the time, reported that Chamblee would "play fight" with them, which would include pinning them down, opening their legs, and rubbing his clothed genitals against their bodies.  Melanie, who was also age 12 at the time, reported an incident in which Chamblee had pressed his body against hers while she was cleaning out a car.  The girls' mother, Leslie, cooperated with CPS and asserted that she

---

[1]  We use pseudonyms instead of the children's real names.

knew nothing of the alleged abuse. The children were temporarily placed with their maternal grandmother. Leslie moved out of the home, rented an apartment, and eventually regained custody of the children.

¶4.     During the forensic interviews, the girls also said that their cousin, M.J., told them that Chamblee, who was that child's uncle, had also inappropriately touched her. In March 2022, a CPS investigator followed up on this information, interviewed M.J. and her mother, but found no abuse by Chamblee.

¶5.     On October 24, 2022, Chamblee was indicted on two counts of gratification of lust in violation of Mississippi Code Annotated section 97-5-23(1) (Rev. 2020)[2]—one count for the abuse of Maggie and one count for the abuse of Melanie. The indictments indicated that the behavior, only identified as "touching" a child under the age of sixteen, occurred between October 1, 2021, and January 31, 2022.

¶6.     Chamblee retained counsel, who moved for discovery and filed numerous pre-trial motions, including but not limited to a motion in limine to prevent the State's witnesses from testifying as experts on child abuse,[3] a motion for particulars to have the State give the date,

---

[2]  Section 97-5-23(1) provides:

 (1) Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, or with any object, any child under the age of sixteen (16) years, with or without the child's consent, or a mentally defective, mentally incapacitated or physically helpless person as defined in Section 97-3-97, shall be guilty of a felony

[3]  Chamblee moved that State's law enforcement witnesses, and anyone else who was not a properly trained and accepted as an expert witness, not be allowed to give opinion

3

time, and location of each act constituting the alleged crimes, a motion in limine to prohibit the introduction of other crimes or bad acts,[4] a motion to introduce evidence of instances of false allegations brought by Melanie and Maggie and their cousin, M.J.,[5] a motion to dismiss the indictment, and a motion for change of venue.

*Pre-trial Motions Hearing*

¶7. On December 5, 2023, the court heard arguments on Chamblee's motion to dismiss the indictment and amended motion to introduce evidence of false allegations by the accusers. Concerning the first motion, Chamblee argued that the indictment lacked sufficient particularity and specificity to enable Chamblee to adequately prepare any meaningful alibi defense. Chamblee presented his own affidavit that of the 123 days set out in the indictment, on sixteen of those days, he was not physically present in the county. The court took the motion under advisement.

¶8. Concerning the false-allegations motion, Chamblee's counsel raised two instances when Maggie and Melanie had allegedly falsely accused someone of sexual abuse. In 2015, when Chamblee was in jail, Chamblee's uncle, James Hamilton, and Hamilton's son, Sonny, stayed in the Chamblee home. Both had mental issues. Hamilton eventually moved to an assisted living facility, and Leslie decided she wanted Sonny out of the house. Chamblee's

---

concerning the alleged child abuse in this case.

[4] The motion did not identify any specific bad act, prior conviction, or uncharged accusation.

[5] In this motion, Chamblee included the allegation against Sonny, which the girls later told Michael was not true, and an allegation that the girls' cousin M.J. had made about Chamblee, which the CPS investigator deemed to be without merit.

4

defense counsel argued that Leslie told Chamblee's brother, Michael, that the girls said Sonny had sexually molested them. Michael went to the home, beat up Sonny, and took him away. But later, when Michael returned to the home and talked with the girls, they said, "Momma told us to say that." Chamblee argued that under Mississippi Rule of Evidence Rule 412, such testimony is admissible as a prior false allegation of sexual offenses.[6]

¶9. Defense counsel raised a second allegation of false accusations when the girls told their CPS forensic interviewer that Chamblee had inappropriately touched their cousin, M.J. However, when M.J. was interviewed, there was no basis for the allegation. Chamblee's counsel equated this to a "me too" situation, where, although the girls themselves were not making an accusation, instead, they were trying to get M.J. to accuse Chamblee and bolster their story by saying it happened to her too. The court felt this alleged accusation stemmed from the current allegations made against Chamblee for which he was on trial and, thus, would not be considered under the Rule as prior false allegations by the girls. Chamblee's attorney then pivoted to arguing that Leslie had made the false accusation of Chamblee's abuse of the girls. Counsel pointed out that prior to October 2021, things in the home were fine. But when Leslie learned that Chamblee had been with another woman, she "saw a separation coming and told the girls it was time to talk," implying that Leslie enlisted the girls in a plot to accuse Chamblee. As support, counsel said Leslie also tried to title the

---

[6] Mississippi Rule of Evidence 412 (b)(2) provides:

The court may admit evidence of . . . false allegations of sexual offenses made at any time before trial by the victim.

house solely in her name by forging Chamblee's signature on documents. Defense counsel argued that this evidence would be an exception to the rule against hearsay under Mississippi Rule of Evidence 404(b) to show propensity, motive, proof, plan, and absence of mistake. The State responded that what the defense presented was perhaps some personal plan that Leslie had, but it did not constitute false allegations or prove they were made by the victims. Moreover, M.J. never said that the girls had told her to accuse Chamblee of anything.

¶10.    The court ruled that the proof of the 2015 allegedly false accusations by the girls against Sonny in 2016 was "not sufficient" to be allowed into evidence. The court pointed out that the defense had interviewed the girls recently, and they did not remember anything from back in 2015. So any testimony about what they said at that time was not proper impeachment. Concerning the cousin, M.J., defense counsel attempted to locate on Maggie's forensic interview video precisely where she said that Chamblee had done the same thing to M.J. Until that could be found, the court stated that it would reserve ruling. But thus far, the court did not find enough specificity to establish that Maggie made an actual false accusation under Rule 412. Moreover, if Maggie had made a false statement, then the court stated it was not a past false accusation, but a current allegation of something for which Chamblee was on trial.

*Motion for Change of Venue*

¶11.    Chamblee filed his motion for a change of venue on November 2, 2023. He alleged that

> the general public and local Leake County law enforcement have made several
> public statements prejudicing the Defendant in Leake County. The prejudice

6

to the Defendant in Leake County will prevent a fair and impartial jury pool. As support, Chamblee attached his own affidavit and thirty identical form-style affidavits from residents, each stating:

> Affidavit of _____
>
> COMES NOW the Affiant, _____. I live in Leake County, Mississippi, my address is _____. I am aware of the charges against Brandon Chamblee. I am aware of the public sentiment against Brandon Chamblee. In my opinion, he cannot, under any circumstances or restrictions, receive a fair or impartial trial in Leake County, Mississippi. This opinion is based on what I have heard, seen, and observed in multiple media outlets, including but not limited to social media, television, and newspaper since the date of his arrest.
>
> This the ____ day of _____, 2023.
>
> _____
> Signature of Affiant

Chamblee's affidavit described an encounter he had with the sheriff and deputies at the courthouse after a prior hearing in the case held on September 5, 2023.

¶12. On January 8, 2024, the court held a hearing on the motion for change of venue. The defense opened by citing Mississippi Code Annotated section 99-15-35 (Rev. 2020)[7] and

---

[7] Section 99-15-35 states:

> On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.

Rule 11.1 of the Mississippi Rules of Criminal Procedure,[8] and counsel stated that "a presumption arises that an impartial jury cannot be obtained when a motion is properly filed."[9] Counsel pointed out that on March 29, 2022, a news source, Kicks96news.com, reported on "Child Molestation and Domestic Violence in Attala and Leake" and included Chamblee's photograph among fourteen men recently arrested. Chamblee was the only one charged with child molestation. Counsel said that the story was still available online and did not contain any disclaimer that the individuals mentioned were presumed innocent until proven guilty.

¶13. As his first witness, Chamblee called his cousin Brady Chamblee, who had lived in Leake County all his life until six months before the trial. Brady identified a copy of the

---

[8] The relevant sections of Mississippi Rule of Criminal Procedure 11.1 include:

(a) Grounds. The trial judge, for good cause, may grant the defendant a change of venue. Good cause includes a satisfactory showing made to the court in writing, supported by the affidavits of two (2) or more credible persons, that the defendant cannot have a fair and impartial trial in the county where the offense is charged to have been committed.

(b) Prejudicial Pretrial Publicity. Whenever the grounds for change of venue are based on pretrial publicity, the trial judge shall consider the level of adverse publicity (both in extent of coverage and its inflammatory nature) and the potential effect of such publicity on the venire.

[9] "Pursuant to Mississippi law, a presumption arises that an impartial jury cannot be seated where the defendant files an application for a change of venue along with two credible affidavits stating that the defendant is unable to receive a fair trial in the county due to unfavorable public opinion." *Byrom v. Epps*, 817 F. Supp. 2d 868, 904-05 (N.D. Miss. 2011), *aff'd*, 518 F. App'x 243 (5th Cir. 2013) (citing *Gray v. State*, 799 So. 2d 53, 62 (Miss. 2001); Miss. Code Ann. § 99-15-35). "In the absence of such a presumption, Petitioner must show "an actual, identifiable prejudice on the part of members of the jury that is attributable to that publicity." *Id*. (quoting *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984)).

Kicks 96 social media post, which was entered into evidence. Brady had worked with the Carthage, Pelahatchie, and Forest Police Departments as a patrolman and had also been a fireman. He said no one has talked to him about the Kicks 96 post, although "it was all over social media." Brady told the court that he saw the post on "social media, like third party Facebook links, people was talking about it . . . bashing him for being a sex predator." He said there was an entire Facebook page on sex offenders, and Chamblee got put on the page.[10] He felt that Chamblee could not get a fair trial in Leake County "because of his history here. Everybody knows him. Just his past." Brady said Chamblee had a bad reputation because of previous encounters with law enforcement, arrests, and serving time in prison.

¶14. Chamblee next called Randy Comans, twenty-five years old, who, except for one year, has lived his entire life in Leake County, residing in the Lena, Union, and Rosebud communities. Other than being married to Chamblee's third or fourth cousin, Comans did not go to school or church with Chamblee. He said Chamblee's reputation was "less than stellar" and "a bit rocky" and that basically, "folks don't necessarily like him." Comans said Chamblee had his fair share of run-ins with the law, and once you are on the County's radar like that, "pretty much everybody knows it, and they look at you in a certain way after that. It's a simple fact." Comans said when he was fourteen years old, he knew Chamblee's name before he ever knew Chamblee as a person. Chamblee was known as a hothead, rough, and rowdy. Comans learned of Chamblee's charges when he saw the Kicks 96 post of the jail

---

[10] This page was not produced or entered into evidence.

docket on Facebook. Comans said that he had overheard a couple of men at Walmart saying that without a shadow of a doubt, Chamblee did it, and they were angry. The court asked Comans if he had enough knowledge of people from one end of the county to the other to say that everyone had prejudged Chamblee, and Comans replied it would be difficult to find twelve people who did not know each other in some form or fashion and had talked about things.

¶15. Chamblee also called Gregory Redwine, age forty-five, who had lived in Leake County for the past five years. Prior to that he had lived in Brookhaven, but before that he had lived in Leake County for ten years. He met Chamblee when they worked together about fifteen years ago. Redwine said that he learned of the charges against Chamblee from the Kicks 96 app on his phone, which notifies him of weekly arrests. Some people asked him about Chamblee's charges because they knew Redwine had worked with Chamblee. Some would say, "[D]id you hear what [Chamblee] done now?" Most people have a bad opinion of Chamblee because "he is very hotheaded and he's had altercations with about ninety percent of Leake County."

¶16. After Redwine, Chamblee testified that at a prior court hearing in the case, held on December 5, 2023, Jerry Horn, an investigator for the sheriff's office, asked him to step into the hall. Sheriff Randy Atkinson was there, and the hallway was packed because it was docket-call day. Chamblee stated that Sheriff Atkinson told him that "people above him and the people throughout the county" were sick of him and wanted him to go to jail, guilty or not. Chamblee surmised that he was going to prison if the trial was held in Leake County

10

because people would stand with the sheriff, and "if the sheriff believes it, everyone is going to believe it." Horn and Quick heard everything and were nodding in agreement. Chamblee also said that he had been working with the Mississippi Bureau of Narcotics as an undercover informant for seventeen years and that he had testified against many Leake County residents.

¶17. After this testimony, the State called its witnesses, Kara Parkison and Dakota Presley. Parkison testified that she had lived in Carthage for a year, and prior to that she had lived for fifteen years in Walnut Grove, both being in Leake County. Her "family" in Leake County was limited to her in-laws. She was currently a payroll clerk for the board of supervisors; prior to that, she worked in a nursing home. She did not know Chamblee or the charges against him. Her only interaction with law enforcement was through her job. She had only seen a "blip" in the newspaper about the upcoming trial and had formed no opinion on the case. Parkison said that she has not attended social functions in the county and that she does not travel. Despite this, she said that she knew a lot of people in the county, although mainly in Carthage. Parkison was familiar with Kicks 96, and she checks its app about once a month, including the jail docket reports.

¶18. Twenty-nine-year-old Presley initially came to Leake County five years beforehand to teach, but for the past two years, she worked as the director of the chamber of commerce. She did not know Chamblee or the charges against him. She said that she talked weekly to the "ladies up front" in the sheriff's office as well as the sheriff, but they did not discuss criminal cases. Presley agreed that the sheriff and law enforcement were prominently displayed on her own Facebook page. In her job at the chamber of commerce, Presley said

11

she interacts with business owners, banks, and government officials. Her conversations with them are mainly about their business and how the chamber could help. She attended church in Philadelphia, Mississippi (outside the county), but for the last two years, she has belonged to the rotary club that meets in Carthage. Presley said she did not know of any reason why Chamblee could not get a fair trial in Leake County. Presley told the judge that she did not check jail dockets on social media.

¶19.    After these witnesses, counsel argued the motion to the court. In its ruling from the bench, the court noted that the State's witnesses had not heard of Chamblee or his charges. If they were called as veniremen and survived voir dire, they would be able to sit as jurors because they had made no prejudgment of Chamblee's guilt or innocence. The court then stated, "So they are representative of the community." Chamblee's witnesses, however, were either family members or friends. They would know a good bit more about him than would the public. The court reviewed the Kicks 96 post and declined to get into any further discussion about whether the post contained a disclaimer of innocence "because that would bring in a whole other freedom of speech issue." Moreover, if the court considered the post as grounds for a change of venue, it would have to do so in all other Leake County cases. The judge noted that in his tenure as a judge since 2021, the issue of the docket postings on social media had never come up as grounds to change venue.

¶20.    Having grown up in Leake County, the judge said that he was aware of how large a county it was. As he listened to the witnesses, the judge said he tried to get a sense of how wide their social circles were to determine if they were representative of the community. The

court concluded that Chamblee's witnesses knew Chamblee, but they did not know a significant number of other people. Even though there was testimony of social media posts, the witnesses could not say how many people posted or reposted comments. Thus, the defense had presented the court with just three people who knew Chamblee, as well as Chamblee himself, who testified to a statement the sheriff made. Neither side called the sheriff as a witness, but the court stated that the sheriff's statement was not intended to be a public pronouncement. Accordingly, the court found that the State had rebutted the presumption that Chamblee could not get a fair trial in Leake County. The court noted that as they proceeded with voir dire, it may change its decision, but as of the hearing date, the motion to change venue was denied. On January 8, 2024, the court entered a written order denying the motion.

*Trial*

¶21. Trial began on January 8, 2024, with voir dire of the venire. The record does not reflect how many potential jurors appeared, but the court summoned all of its six jury panels to attend. The court began by asking if anyone was related to, had a friendship with, or knew Chamblee. The court, on its own, excused several individuals—one who worked in the chancery court office and was familiar with a protective order that the chancellor had issued against Chamblee related to this matter, and another who had grown up next door to Chamblee and knew him and his family. The court also excused several women who had been sexually abused as children. After the State and the defense questioned the panels and offered their objections during jury selection, the court excused several others, including a

woman whose ex-husband (a law enforcement officer) had worked on many cases involving Chamblee, a man who was related to Leslie, and a woman whose first cousin was Leslie's mother. During the general voir dire questioning, only two people said they were familiar with the mugshots of arrests that Kicks96 puts on its app. There were sufficient persons in the venire for both the State and Chamblee to use their strikes and still have several to choose alternate jurors. The jury was seated, and the trial began.

*Prosecution's Case*

*Amanda McCarty*

¶22. The State's first witness was Amanda McCarty, a supervisor at the Leake County CPS, who explained that their office receives reports of abuse through a hotline. They screen the calls and must investigate reported complaints within thirty days. In this case, a report came in on Maggie and Melanie. McCarty interviewed the girls and found sufficient basis to have them undergo forensic interviews with professionals trained to talk with children about these matters. As the CPS worker, she accompanied the girls to those interviews, but she was not in the room during their questioning; however, the interviews were recorded. McCarty testified that CPS opens a case on a family when a report is made. In this case, after the forensic interview, the girls went to stay with their grandparents but eventually returned to live with their mother.

¶23. On cross-examination, Chamblee's attorney questioned McCarty about prior reports made to CPS about Chamblee's family, one in 2015-16, one in 2018, and one in 2021. McCarty confirmed that all involved charges of physical abuse, physical neglect, and sexual

14

abuse, and all were unsubstantiated. However, McCarty still felt there was abuse in the home. At a "family team meeting," held after an earlier report, it was decided that the mother would leave and Chamblee agreed. He was responsive, cordial, and agreed to counseling. McCarty said Leslie left and was doing well, but then she went back home, "as abuse victims normally do." In these earlier investigations, the girls reported that they loved Chamblee, commenting that "he takes us fishing; he takes us hunting; we have a better relationship with him than we do our biological dad." McCarty agreed that Chamblee and his stepson attended counseling and enjoyed many father-son activities, like hunting and fishing. When asked "what changed," McCarty replied that in her opinion the children were older and were not afraid of Chamblee. In her opinion, the children also suffered emotional abuse from witnessing the domestic violence in the home inflicted by Chamblee, who McCarty felt was a "repeat offender."

*Leslie Chamblee*

¶24.    Leslie, Chamblee's wife, testified next. She learned about Chamblee's abuse of the girls when CPS contacted her regarding the anonymous report they received. The girls were placed with Leslie's parents, and she moved in with her sister. Eventually, she rented an apartment and regained custody of her children. She filed for a divorce, but it was her understanding that Chamblee had not yet signed the papers.

¶25.    Leslie described their home life before this CPS report. Chamblee had a business that sometimes called him to work construction out of state. The children had chores and were in bed by 8:00 p.m. each night. They all went to church together most Sundays. Chamblee

15

taught her son to hunt and fish, and they went to deer camp several times. Leslie agreed that she was surprised at the CPS report because this type of behavior was "totally out of character for him." She agreed that she and Chamblee had started the adoption process and that her children were seen by a doctor who confirmed their health. She and Chamblee told the children about the adoption and how their last name would be changed to Chamblee. Leslie said they were all going to be a family "until he molested my daughters and it came to light and we left."

¶26. On cross-examination, Leslie was questioned about an incident in 2015 when they had taken Sonny into their home. Sonny, age seventeen, had some mental-health issues. At the time, Leslie was working at Regions Bank, and she helped monitor Sonny's money. She admitted that there were some allegations of dishonesty on her part that were reported to the Philadelphia Police Department. Leslie said Chamblee was in jail at the time. Leslie further testified that she contacted Michael, Chamblee's brother, to take Sonny away because Sonny had grabbed one of the girls by the leg and was being mean to them. She said Michael came and dealt with the situation.

¶27. Leslie admitted that around October 2021, the time when the alleged sexual abuse began, she found out that Chamblee was with another woman on one of his out-of-state work trips. She said she did not care, yet she admitted that she then sent Chamblee's brother, Michael, sexually explicit videos of herself. She said that she did not do this to get Michael to help her get a divorce from Chamblee or to support her in Chamblee's trial. She said she sent them "because it was Mike's birthday."

*Maggie*

¶28.   The State's next witness was Maggie, then fourteen years old.  The court excused the jury and determined her ability to testify.  After the court found her competent, the jury returned, and Maggie told them that the CPS got involved because Chamblee was touching her and her sister inappropriately.  She said he would "play fight" and get on top of them and touch their thighs.  One day in January or February of 2022, when he was play-fighting with her in the laundry room, Chamblee came behind her and reached over and squeezed one of her breasts.  She pulled away.  She told Melanie about this as well as her cousin, M.J.  Maggie said that at times when her mother was not there, Chamblee would throw her on his bed, cover her face with a pillow and "rub his junk" (his private part) on her.  She could feel Chamblee's private part get hard, and he would move up and down.  Both he and she were clothed.  Maggie said this happened multiple times and would last for twenty minutes.  When she would get up, he would toss her back down.  Maggie said this would also happen in the living room, or he would come into her room.  Maggie stated that this seemed sexual to her and not just playing because Chamblee would have her pinned down and would spread her legs open.  She said this upset her, but she felt trapped.

¶29.   On cross-examination, Maggie agreed that Chamblee was the disciplinarian who would whoop them if they broke the rules.  Maggie admitted she told CPS that Chamblee had done the same things to M.J. and that CPS investigated, and "nothing happened."  Maggie also claimed that Chamblee did something to a light in the bathroom so he could watch her.  But she could not identify the light when she was shown pictures of the bathroom.

*Melanie*

¶30.   Melanie testified next after the court found her competent to testify. She, too, was fourteen years old at the time of the trial. During the initial questioning, Melanie was emotional and had to compose herself. Melanie stated she was currently living with her aunt during the week so she could go to a certain school. But most of the time, she lived with her mom, her sister, her brother, and Jason Hall (her mother's boyfriend). Melanie said that when she lived with Chamblee, she and Maggie had their own rooms, but she no longer wanted to live with Chamblee because he had touched her breast and butt inappropriately. She said that Chamblee would act like he was "play fighting" and tickling her, but he would put his hand on her breast. Chamblee would throw her on the bed and lie on top of her, "squishing" her, and she could feel his private part on her back or her butt. This would last ten to fifteen minutes; if he heard someone, he would stop. Both she and Chamblee were wearing clothes. She said the last time Chamblee did this was when she went to the alternative school in October 2021.

*Motion for Mistrial*

¶31.   On cross-examination, Melanie admitted that she told the forensic examiner that Chamblee had touched her only one time. She said she was scared at the time of the interview to say more. Chamblee's lawyer asked Melanie about the incident she described to the interviewer when she said Chamblee had pressed his penis against her. She told the interviewer that she was cleaning out her mother's car, and Chamblee came to inspect it and leaned over her to reach the seat pocket.

18

¶32.    At this point, while his attorney was questioning Melanie, Chamblee stood up and said, "Objection, your honor.  Excuse me.  Can I have a minute to . . . ."  The court replied, "No.  You don't get to talk."  Chamblee's attorney asked what was going on, and Chamblee said, "He's sitting back there coaching this kid - - ."  At this point, the court told Chamblee to sit down and excused the jury and the witness.  The court admonished Chamblee and gave him one minute to talk to his attorney.  Thereafter, Chamblee's lawyer told the court that Chamblee saw Melanie's grandfather, who was sitting in the back of the courtroom, "giving a thumbs up and nodding his head and making gestures while she was testifying." The court recessed to consider this allegation.

¶33.    On his return, the court brought everyone from the back of the courtroom to the front and put them under oath.  This included Melanie's grandfather and grandmother, Jason Hall (Leslie's current boyfriend), Cindy Crane (Leslie's landlord), and the Carthage Chief of Police, Billy McMillan.  The grandfather denied giving any signs to his granddaughter and said that his hand was cramping, and he was rubbing it.  Hall, who was sitting behind the grandfather, and Crane, who was sitting next to him, said that the grandfather was rubbing his hand "like it was hurting him."  The court then brought Melanie in and asked her if she felt anyone was trying to affect her testimony.  She answered that she "had a little thumbs up" from her "pawpaw."  She repeated the gesture and said she felt it meant she was doing good and "wasn't letting him (Chamblee's attorney) like come over me."  The child was excused, and the court removed the grandfather from the courtroom.  Since it was after 5:00 p.m., the court sent the jury home and then heard testimony from Chamblee about the alleged

coaching. Chamblee said he saw the grandfather lean over the seat in front of him with both hands and give Melanie two thumbs up (which he demonstrated). The grandfather also mouthed "that it was a good job." Chamblee described where he was sitting and how he could observe people in the audience. The grandfather was approximately eighty feet away. Chamblee said Hall and Crane were seated behind the grandfather and could not see his facial expressions.

¶34.   After Chamblee testified, his counsel moved for a mistrial. The judge noted that he did not see the grandfather's gesture and stated that no evidence was presented to establish that the jury saw them. The State argued that the jurors would have had to turn their heads completely around to see the gestures. The court agreed that it was improper for anyone in the audience to communicate with a witness. But the court stated that the witness did not take it as "coaching," and a defendant cannot disrupt proceedings and then use the disruption as grounds for a mistrial. The court recessed for the day and returned the next morning with its ruling.

¶35.   In the morning, outside the presence of the jury, the court stated it had the discretion to declare a mistrial if it was caused by misconduct of a party. The court noted Chamblee's outburst, which the jury did see, and the conduct by the grandfather, which the jury did not see. The court found that the grandfather's conduct was outside the presence of the jury and did not seem to affect the testimony of the witness, although the court noted that the witness was emotional. The court found this conduct was not coaching a witness and that there had been no showing of substantial or irreparable prejudice to Chamblee. The court summoned

20

the grandparents before him, found the grandfather in contempt, fined him $100, and barred him from further attendance at the trial.

¶36. The court brought the jury in and addressed them, stating:

THE COURT:

Good morning, ladies and gentlemen of the jury. Thank you for your patience both yesterday and today. I know we're getting started a little bit later. There were some preliminary matters that I had to handle outside of your presence.

I told you about that during our voir dire that there would be matters outside of your presence. You probably didn't think there would be this much but there sometimes are.

Just to kind of go over where we've been since yesterday. We're still in the State's case. The State was still presenting its case in chief to you.

And where we left off yesterday, we did have a witness on the stand testifying. And at the point right before I sent you to the jury room and then ultimately excused you for the day, the defendant in this matter, he stood up, he stated objection, and then he proceeded to explain why he stood up and started addressing the Court.

At that point, I did tell the defendant he is not allowed himself at this point to straight address the Court. That is the role of his attorney.

If he has matters that need to come before the Court, that's supposed to go through his attorney. Explaining that to him, he understood that, and I believe we've got that understanding going forward.

However, any outbursts, disruption that caused within the proceedings, and this is an instruction from the court of law to you, is not to be a part of your decision making in this case. It is not evidence of anything.

When I explain to you how to make your decision within the deliberation room, that is going to be from testimony you hear and evidence admitted to the Court from this witness stand at this point.

I know y'all have answered this question. You do understand that, and you understand and agree that you will not use, again, that -- him standing to make his objection and then those statements as any evidence whatsoever for or against him. You understand?

(Jurors answered in the affirmative).

¶37. Melanie continued to testify about the incident when she was cleaning her mother's car. She said she told the interviewer that Chamblee reached over her to get something out

21

of the seat's back pocket, and she felt his "thing" on her back. She said he made no other body movement, only to reach for something in the seat pocket. Melanie admitted that she told the interviewer that this was the only time that Chamblee ever made her feel uncomfortable. She said she also told the interviewer that Chamblee would play fight with M.J. and with Maggie. Melanie told the interviewer that no one had ever tried to touch her below her waist—"down there." She also said no one had ever touched her in a place that was not okay. But Maggie told her that Chamblee touched her (Maggie) on her breast when they were play-fighting.

¶38. After Melanie's testimony, the State rested. Chamblee reminded the court of his motion to dismiss the indictment or require the State to specify the dates of the touching in the indictments that had been argued in December 2023 but had not been ruled upon. The court denied that motion as well as Chamblee's motion for a directed verdict.

*Defense*

*Eric Quick*

¶39. Chamblee called Eric Quick, an investigator with the Leake County Sheriff's Office, who was present at the girls' forensic interviews. He said Melanie did not appear to be scared. She was fairly calm because she was in a safe, friendly environment. She never cried nor got emotional. From his observation, she appeared to be telling the truth in the interview.

*Michael Chamblee*

¶40. Chamblee next called his brother, Michael. Michael stated that in 2015 he received a call from Leslie, who asked him to remove Sonny from their home, which Michael did.

22

The court cautioned counsel about its prior rulings prohibiting questions concerning conversations with the girls at that time. When counsel asked Michael if he had an opinion about whether the girls were telling the truth about Sonny, the court sustained the State's objection. Feeling felt that the defense was violating its pre-trial ruling, the court prohibited further questions about the 2015 incident, and excused the jury so that Chamblee could make a proffer.

¶41. During the proffer, Michael stated that Leslie told him Sonny had touched the girls. So Michael went over to their house and slapped Sonny because he was mad. Michael said he beat up Sonny and dragged him away. Sonny told him repeatedly that he did not do anything, and Michael went back to the house to talk to the girls. Melanie said she just showed Sonny where she had gotten a shot in her hip. Both girls said they did not like Sonny, and they wanted him gone. Michael said his wife, Tracey, may have said that Leslie told the girls to accuse Sonny. At the end of this proffer, the court reiterated its prior ruling that the testimony was irrelevant.

¶42. Chamblee continued questioning Michael in a second proffer concerning Leslie's offer to have sex with him if he would help her with the case against Chamblee. Michael said that Leslie sent him pictures and videos and kept asking him about the case, but she never came out and said she would have sex with him if he would help her. He and she never had any conversations about that. She had always been like a sister to him. At the end of this proffer, the court stated that the defense could ask Michael if Leslie had asked him for help on the case, but that was all—nothing about the video or photos. After the proffer and the

23

jury's return, Michael testified that he and his brother did not get along, but they were brothers. They would butt heads because they were both the same, but there have never been any allegations of sexual misconduct against Chamblee.

*Latosha Christmas*

¶43. Chamblee's next witness was Latosha Christmas, a licensed master social worker at the Mississippi Children's Advocacy Center. She explained the interview process at the center and described the interview she conducted with Melanie on February 22, 2022. She said Melanie appeared to be very comfortable. Melanie reported only one incident: when she was cleaning the car, and Chamblee came up behind her, and put his "thing" (penis) on her back. The court allowed the video and synopsis of Christmas's interview of Melanie into evidence. The video was played to the jury.

*Verdict, Sentence, Post-Trial Motion, and Appeal*

¶44. Chamblee chose not to testify and rested. The State presented no rebuttal. The court ruled on the jury instructions to be given, and the jury heard the closing arguments of counsel. On January 10, 2024, the jury returned a verdict of guilty on the count concerning Maggie, but not guilty on the count concerning Melanie. On January 12, 2024, the court sentenced Chamblee to fifteen years in the custody of the Mississippi Department of Corrections. The court suspended three years of that sentence, leaving twelve years to serve without eligibility for parole and ordered that Chamblee be placed on three years of post-release supervision.

¶45. On January 30, 2024, Chamblee filed a motion for judgment notwithstanding the

verdict (JNOV) or, in the alternative, a new trial. He argued that the evidence was insufficient to sustain the jury's verdict, that the court erred in denying his motion for a directed verdict, and that the court erred in denying his motions to dismiss the indictment, to change venue and to introduce evidence of false allegations by the accuser. Further, he claimed that the court should have granted his motion for a mistrial.

¶46. On February 16, 2024, the court denied Chamblee's motion for a JNOV or new trial. On March 15, 2024, Chamblee appealed[11] and raises the following issues: whether the court erred in denying his motion for a change of venue, whether the court erred in denying his motion for mistrial, whether the court erred in excluding evidence of false accusations of sexual mistreatment by Sonny, whether the court erred in excluding photographs Leslie had sent to Michael to entice him to testify against Chamblee, and whether the verdict was contrary to the weight of the evidence.

**Discussion**

I. **Whether the court erred in denying Chamblee's motion for a change of venue.**

¶47. Chamblee argues that the circuit court erroneously denied his motion for a change of venue when even the court agreed that his properly filed motion created a presumption that he could not receive a fair trial in Leake County. The State argues that it rebutted the presumption.

---

[11] On April 23, 2024, the trial court allowed Chamblee's trial attorneys to withdraw and appointed the State Public Defender's Office as Chamblee's counsel in the appeal. Thereafter, the public defender's office filed another notice of appeal on April 24, 2024.

25

¶48.   Under Mississippi Code Annotated section 99-15-35,[12] a motion for a change of venue must be in writing and supported by affidavits of two or more credible persons showing that the defendant cannot receive an impartial and fair trial in that particular county because of prejudgment of the case or grudge or ill will to the defendant in the mind of the public.  *See Scott v. State*, 395 So. 3d 1252, 1257 (¶16) (Miss. Ct. App. 2024); *Davis v. State*, 767 So. 2d 986, 993 (¶15) (Miss. 2000).  The motion for a change of venue must conform strictly to the statute.  *Lewis v. State*, 374 So. 3d 529, 541 (¶32) (Miss. Ct. App. 2023) (citing *Smith v. State*, 981 So. 2d 1025, 1033 (¶39) (Miss. Ct. App. 2008)).  When a proper application is filed, i.e., one that is sworn to by the defendant and accompanied by the affidavits of two or more individuals, a presumption arises that an impartial jury cannot be obtained.  *Scott*, 395 So. 3d at 1257 (¶16).  However, in all but narrow circumstances, the presumption is rebuttable.[13]  *Id*.

¶49.   Ultimately, "[t]he decision to grant a change of venue rests soundly in the discretion of the trial judge."  *Godbolt v. State*, 407 So. 3d 86, 108-09 (¶68) (Miss. 2024) (citing *King*

---

[12]   The statute appears in full in footnote 8, *supra*.

[13]   The following factors make the presumption irrebuttable:

(1) Capital cases based on considerations of a heightened standard of review;
(2) Crowds threatening violence toward the accused;
(3) An inordinate amount of media coverage, particularly in cases of
    (a) serious crimes against influential families;
    (b) serious crimes against public officials;
    (c) serial crimes;
    (d) crimes committed by a black defendant upon a white victim;
    (e) where there is inexperienced trial counsel.

*Davis v. State*, 196 So. 3d 194, 198 (¶18) (Miss. Ct. App. 2016).

*v. State*, 960 So. 2d 413, 429 (Miss. 2007)). "In reviewing whether the trial court abused its discretion in denying a change of venue, we look to the completed trial, particularly including the voir dire examination of prospective jurors, to determine whether the accused received a fair trial." *Scott*, 395 So. 3d at 1257 (¶17). Moreover, on appeal we will not disturb the ruling of the trial court where the trial court has not abused its discretion. *Id*. "The reviewing court should not reverse a discretionary finding by the lower court unless it comes to a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Tisdale v. S. Cent. Reg'l Med. Ctr*., 411 So. 3d 227, 231 (¶7) (Miss. Ct. App. 2024). But "in applying the applicable abuse-of-discretion standard of review, this Court may not reweigh the evidence or substitute its judgment for that of the trial court." *Id.* (internal quotation marks omitted).

¶50.    In the case at hand, Chamblee's motion complied with the requirements of section 99-15-35 and Mississippi Rule of Criminal Procedure 11.1. He attached his own affidavit and more than enough supporting affidavits. However, the number is less impressive given the form-nature of the affidavits, with each stating the same words, with only names and identifying information appearing to be original. Individually crafted affidavits expressing the personal sentiments of the signatory and the factual basis for their opinions would have been more persuasive.

¶51.    Bolstering Chamblee's request, however, was the testimony provided by his witnesses. Although he was family, Chamblee's cousin Brady stated that Kicks96 post of Chamblee's mugshot was "all over social media," with several tags and shares, and wound up on another

site for sex offenders. A more distant relative by marriage, Comans, testified that he saw the social media post as well and stated, "I probably saw people talking about it for quite a few months nonstop when it first came to light based solely off this." Some were calling for him to "automatically be thrown away" (i.e., sent to jail), and they would be happy about it. Some did not think he did it. Chamblee's third witness, Redwine, testified that some people asked him about Chamblee's charges because they knew Redwine had worked with Chamblee. Some would say, "[D]id you hear what [Chamblee] done now?" Redwine said that most people have a bad opinion of Chamblee because "he is very hotheaded and he's had altercations with about ninety percent of Leake County."

¶52. However, the State's witnesses, who were not related to Chamblee and who had more contact with the public due to their positions with the board of supervisors and the chamber of commerce, did not know Chamblee and had not heard of him. Parkison testified that she might check out the Kicks96 posts on jail dockets, but she was not influenced by them. Presley testified that she knew of no reason why Chamblee could not get a fair trial in Leake County.

¶53. "We must consider the level of adverse publicity along with the extent of the effect the publicity had upon the venire persons." *Smith*, 981 So. 2d at 1033 (¶40) (citing *Conner v. State*, 726 So.2d 1238, 1240 (¶10) (Miss. Ct. App. 1998)). Here, the amount of pre-trial publicity was minimal. In fact, the only "publicity" in this case was the Kicks96 jail docket post on social media, which contained Chamblee's photograph and his charges. However, in the later voir dire of the venire, only two individuals acknowledged seeing the Kicks96

post—one could not remember what it was, and the other said she saw such postings but not the one in this case. This single post over eighteen months prior to trial was not nearly equal to what the *Scott* defendant attached to his motion, yet we still affirmed the denial of a motion for change of venue in that case. *Scott*, 395 So. 3d at 1258 (¶19). There, Scott was charged with molesting his stepdaughter, getting her pregnant, and then absconding for two years. *Id*. at 1254-55 (¶¶3, 7). We affirmed the circuit court's denial of Scott's motion for change of venue, *id*. at 1258 (¶21), even though he submitted "printouts of Google search results of his name and Google image results of his name, Facebook posts and comments, and copies of news articles containing facts about the case and the events surrounding his abscondment and eventual arrest." *Id*. at 1255 (¶8). We noted that the circuit court weighed this against other information, such as juror-questionnaire results showing most said they did not know the defendant and could be impartial. *Id*. at 1258 (¶28).

¶54. We note here that the State did not rebut Chamblee's affidavit and testimony about the statements made by the sheriff. However, during voir dire, only two potential jurors said that they had spoken to the sheriff, knew him, or had any affiliation with him. No juror was asked if he or she was aware of the sheriff's comments concerning Chamblee. Nor did Chamblee present any substantiating testimony to support his affidavit that the Sheriff even made these remarks.

¶55. The voir dire in this case supports the circuit court's denial of the motion to change venue. The court sua sponte excused jurors who had been molested and granted most of Chamblee's strikes for cause. Of those venire members questioned who remained, all

29

indicated they could be fair and impartial. After its selection, Chamblee did not challenge the composition of the jury, move that it be struck, or renew his motion for a change of venue. As in *Hall v. State*, 295 So. 3d 544, 553 (¶16) (Miss. Ct. App. 2019), there is no abuse of discretion when the voir dire reflects an adequate cross-section of fair and impartial jurors. In *Hall*, we noted that an impartial jury could result even though "[s]ome people were indeed removed for cause while others were deemed capable of fairness and impartiality despite their loose affiliations with the victim or other relevant parties." *Id.* Similarly, in this case, considering our limited review of the trial court's discretionary decision, we find that the presumption raised by Chamblee's properly filed motion for a change of venue was adequately rebutted when taking into consideration the voir dire and the composition of the resulting jury as well. Accordingly, we find no abuse of discretion in the circuit court's denial of Chamblee's motion.

II. **Whether the court erred in denying Chamblee's motion for a mistrial.**

¶56. Chamblee next argues that the circuit court erred in denying his motion for a mistrial when Melanie's grandfather was caught giving Melanie the thumbs-up sign and encouraging her during her testimony. Rule 23.5 of the Mississippi Rules of Criminal Procedure provides in part:

> Upon motion of any party, the court may declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct by a party, a party's attorney(s), or someone acting at the behest of a party or a party's attorney(s), resulting in substantial and irreparable prejudice to the movant's case.

"Whether to grant a motion for a mistrial is within the sound discretion of the trial court."

*Liddell v. State*, 361 So. 3d 152, 155 (¶17) (Miss. Ct. App. 2023). Therefore, we review a circuit court's denial of a motion for a mistrial for an abuse of discretion. *Id*. at 155 (¶12).

¶57. In this case, the record is clear that during Melanie's testimony, her grandfather was sitting in the audience and signaling her. Chamblee said that he saw the grandfather give Melanie the thumbs up sign and saw his mouth moving. He excitedly jumped up and objected, trying to bring the grandfather's conduct to his attorney's and the court's attention. The court stopped the proceedings and cleared the courtroom. The grandfather told the court that he was just rubbing his hands to relieve his hand cramps. Although others sitting around him also said they only saw him rubbing his hands, Chamblee said the grandfather gave the child a "thumbs up" signal and was mouthing something as well. The most important witness, however, was Melanie, who said that she saw her grandfather give her the "thumbs up," indicating she was doing a good job. She showed the judge the gesture her grandfather had made and she said that she felt it meant she was doing well and "wasn't letting him [Chamblee's attorney] like come over me." She mentioned nothing about the grandfather mouthing anything. In light of this testimony, even the court had to agree that the grandfather had acted contemptuously, fined him, and barred him from attending the rest of the trial.

¶58. The Mississippi Supreme Court has held that it is impermissible for an attorney to coach a witness while the witness is testifying. *Williams v. State*, 539 So. 2d 1049, 1053 (Miss. 1989). There, the Mississippi Supreme Court held that a hand signal between a prosecutor and a testifying police officer while being examined by the defense warranted a

mistrial. *Id*. However, the State argues that even if the grandfather was impermissibly coaching the child, the court was correct in finding no prejudice to Chamblee because the gesture had not been seen by the jury, and there was no evidence that it impacted the child's testimony, citing *Tate v. State*, 20 So. 3d 623, 642 (¶48) (Miss. 2009) (stating the trial court is in the best position to determine if an alleged improper comment had a prejudicial effect).

¶59. Chamblee raises a Kentucky case, *Sharp v Kentucky*, 849 S.W.2d 542 (Ky. 1993), where the Kentucky court granted a mistrial under circumstances Chamblee says are similar. There, Hess, a friend of the family, was observed making signals and gestures to a child witness in a sexual abuse case. *Id*. at 546. Hess told the court that she was trying to comfort and encourage the child, and admitted she gave approving gestures by winks and a thumbs-up sign. *Id*. at 546-47. On appeal, the Kentucky Supreme Court held that the conduct warranted a mistrial, stating that "[i]t would be impossible to say that the witness did not derive confidence and assurance from this positive reinforcement which influenced the jury to believe her. *Id*. However, the facts of Chamblee's case are distinguishable from those in *Sharp*, where a bystander testified that Hess' gestures indicated to the child when to answer "yes" or "no" to questions asked. *Id*. at 546. Hess admitted she mouthed "you're doing fine" to the child as well. In the case at hand, Melanie's grandfather just gave her the "thumbs up" sign that the child understood to be encouragement. He was not telling Melanie how to answer questions, as Hess did in *Sharp*. The trial court, which is in the best position to assess the situation, did not find this conduct to be "coaching" the witness.

¶60. Although Melanie's grandfather may have encouraged her, the jury may not have

believed the child because it found Chamblee not guilty on the count that involved her. Thus, Chamblee has not proved the serious and irreparable damage from the grandfather's conduct as required by Mississippi Rule of Criminal Procedure 23.5 to warrant a mistrial. We have held that "in situations where serious and irreparable damage has not resulted, the judge should admonish the jury then and there to disregard the impropriety." *Rayner v. State*, 186 So. 3d 881, 894 (¶51) (Miss. Ct. App. 2015) (remedying a witness's spontaneous remark by striking her entire testimony). Here, the court found that the jury did not witness the grandfather's gesturing, but it did see Chamblee disrupting the proceedings by jumping up and objecting on his own. The court addressed this behavior to ensure that the jury did not hold that disruption against Chamblee.

¶61. There were two alleged victims in this case, Melanie and Maggie, and the charges against Chamblee relied upon the testimony of each of them. There was no evidence that the grandfather coached or otherwise influenced Maggie's testimony, which independently established Chamblee's guilt on Count II. Thus, under these facts and circumstances, we find that Chamblee was not irreparably harmed by the grandfather's conduct in influencing Melanie, when in fact the jury found in favor of Chamblee on Count I. Further, we find that the circuit court acted thoughtfully and thoroughly, and even if we or others may have found differently, because we find no abuse of its discretion, we affirm the circuit court's denial of Chamblee's motion for a mistrial.[14]

### III. Whether the court erred in excluding false-accusation evidence.

---

[14] The abuse-of-discretion standard does not permit appellate courts to substitute their judgment for that of the trial court simply because they might have decided differently.

33

¶62.   Chamblee raises two instances of false accusations of sexual abuse—one by Leslie when she accused Sonny of molesting the girls, and another when the girls accused Chamblee of molesting M.J.  Chamblee asserts that the court erroneously refused to admit this evidence.  We disagree.

¶63.   The Mississippi Rule of Evidence 412(a) prohibits evidence of a victim's past sexual behavior in a criminal case.  However, under Rule 412(b)(2), the court may admit evidence of a victim's false allegations of sexual offenses made prior to trial.[15]  Under the Rule, the defense must make a written motion to offer such evidence and serve it on all parties and the victim not later than fifteen days prior to trial unless it is newly discovered.  MRE 412(c)(1).  The court must hold a hearing on the motion and find that the probative value outweighs the danger of unfair prejudice before admitting the evidence.  MRE 412(c)(2).  These procedures must be followed, as we held in *Lofton v. State*, 818 So. 2d 1229, 1233 (¶14) (Miss. Ct. App. 2002), where a teenage victim of sexual battery had accused her own father of fondling her in another case.  At trial, the court would not admit the testimony because the defendant had failed to comply with the fifteen-day notice requirement.  *Id*. at (¶15).  We agreed.  *Id*. at

---

[15]  Mississippi Rule of Evidence 412 provides:

(a) Prohibited Uses. The following is not admissible in a criminal case involving an alleged sexual offense:
   (1) reputation or opinion evidence of a victim's past sexual behavior; and
   (2) evidence of a victim's past sexual behavior other than reputation or opinion, except under subdivisions (b) and (c).
(b) Exceptions. The court may admit evidence of:
. . . .
   (2) false allegations of sexual offenses made at any time before trial by the victim.

1234 (¶20).

¶64. "As with all evidentiary rulings, a trial court's denial of a motion in limine regarding a Rule 412 motion is reviewed under an abuse-of-discretion standard." *Galloway v. State*, 122 So. 3d 614, 668 (¶177) (Miss. 2013). The trial court must determine whether there is evidence of false allegations and then whether that evidence is relevant, i.e., that its probative value outweighs the danger of unfair prejudice. *Pustay v. State*, 221 So. 3d 320, 348 (¶85) (Miss. Ct. App. 2016). In that case, Pustay sought to have admitted testimony from Jane, his teenage victim, of two prior allegations of sexual assault she made against two separate individuals, as well as a prior allegation against Pustay. *Id*. At the pre-trial hearing on the matter, Jane testified that her accusation against the first named individual did occur, even though she had told Pustay it did not. *Id*. at 347 (¶81). Jane further testified that she made no false allegations against another police officer. *Id*. at (¶84). However, Pustay said Jane had told him about such an incident and because he worked in law enforcement, he reported it to his superiors. *Id*. The police chief, who investigated the report, determined there was no abuse. *Id*. The trial court concluded, and we agreed on appeal, that the evidence presented was insufficient to prove that any false allegation occurred and thus found the evidence inadmissible. *Id*. at (¶86).

### A. 2015 Alleged False Allegation against Sonny

¶65. Chamblee contends that the court erred in not allowing him to ask Michael about accusations Leslie made in 2015 that Sonny had molested the girls. Pre-trial, the court ruled that any false accusation made about Sonny was made by Leslie and not the girls. Thus, it

35

was hearsay and not admissible as a hearsay exception under Mississippi Rule of Evidence 412, which allows only false accusations made by the victims. We agree with the circuit court that any accusations by Leslie are not covered by Rule 412.

¶66. Chamblee further argues that he was not allowed to elicit testimony from Michael that the girls themselves had falsely accused Sonny and that Leslie had put them up to it. However, Chamblee offered no testimony of this in Michael's proffer. Leslie testified at trial that she told Michael that the girls reported that Sonny had grabbed one of their legs and was mean to them. In his proffer, Michael testified that when Sonny protested that he had not touched the girls, Michael went back and asked the girls what happened.

> A. I mean, I felt bad because the boy kept saying he didn't do it. So I went back to - I don't know. I went back because it was my brother's house. And, I mean, I was talking to the kids, and I was asking what happened, whatever. And [Melanie] just said something about she had got a shot and -- that she had got a shot or something and Sonny didn't touch her. It was something about the shot in her hip, you know. Just didn't -- I don't know.

> Q. Yes, sir. Did the girls at any time, [Maggie or Melanie] tell you whether or not it really happened?

> A [Melanie] just said that she showed the shot that was on her hip. Said that's all that happened. She showed the shot that was on her hip.

Thus, Michael did not testify that either of the girls made a false accusation against Sonny. Nor did Michael have any first-hand knowledge of Leslie putting them up to saying anything of this nature.

> Q. Did the girls tell you anything about their mother telling them what to say?

> A. Man, I don't remember everything that happened, man. I think my wife

said that the girls told her something like that [that Leslie had told them to accuse Sonny]. I don't remember. I ain't got a good memory like that. I just remember -- I blacked out, and I did what I did. I beat the boy up. And then [Maggie] turned around and said that he never touched her, that he just looked at the - - that she showed him the shot.

A threshold finding for the application of Rule 412(b)(2) to the admission of evidence is proof that the *victim* falsely accused an individual of sexual abuse. Chamblee did not produce evidence that either Maggie or Melanie falsely accused Sonny of sexually abusing them. In addition, because Rule 412 deals with the admission of false accusations by the victim, it would not apply to anything Leslie said or did.

### B. False Accusation that Chamblee Sexually Abused M.J.

¶67. Chamblee argues that when Leslie found out about his out-of-state girlfriend, she instigated the anonymous report to CPS and coerced the girls to falsely accuse Chamblee of sexually abusing them, as well as their cousin M.J. Chamblee argues that the girls were trying to manipulate M.J. into repeating a false allegation. But the record contains no proof of Leslie's coaching the girls to say anything, nor is there any evidence of conversations or interaction between M.J. and the girls that could be deemed manipulation by them. Upon Chamblee's questioning, Maggie testified, and the jury heard, that she told the interviewer that Chamblee had done the same thing to M.J. The jury also heard Maggie testify that CPS investigated that allegation, and "nothing happened" afterward, i.e., no charges were brought against Chamblee.[16] So what Chamblee wanted the jury to hear was not excluded. Also,

---

[16] At the pre-trial hearing on the motion concerning these false accusations, defense counsel admitted that CPS investigated what Maggie had said and spoke to M.J. at school. CPS found that accusation unfounded "because it must have simply been a miscommunication."

Rule 412 envisions testimony from a victim making false accusations against an individual for sexual misconduct with her, not with a third party. Even the victim in *Parker v. State*, 825 So. 2d 59, 62 (¶7) (Miss. Ct. App. 2002), a case Chamblee cites, accused a different man of abusing her, not that Parker had sexually abused another individual. In *Parker*, we held that a second report about a different man abusing the victim in a different apartment on a different day was not admissible, and Rule 412 was inapplicable on such testimony. *Id*. In the case at hand, we find no abuse of the trial court's discretion, and, in fact, Maggie's testimony concerning M.J. worked in Chamblee's favor.

### IV. Whether the court erred in excluding sexually explicit photographs Leslie had sent to Michael.

¶68. Chamblee next argues that the court erroneously prohibited the admission of the sexually explicit photographs and a video that Leslie made and sent to Michael. Chamblee claims that this evidence was admissible and relevant to his defense, namely that Leslie was biased against him and influenced the girls to accuse him of these crimes. The State replies that the court acted within its discretion to exclude irrelevant and inflammatory evidence when there was no showing that Leslie had actually influenced or manipulated the girls.

¶69. We review a trial court's admission or exclusion of evidence for abuse of discretion. *Smith v. State*, 417 So. 3d 146. 149 (¶9) (Miss. 2025). "[A]n abuse of discretion . . . may be found . . . where the reviewing court has a definite and firm conviction that the court below committed a clear error of judgment and in the conclusion it reached upon a weighing of the relevant factors." *Magee v. State*, 231 So. 3d 243, 249 (¶12) (Miss. Ct. App. 2017). Under Rule 402 of the Mississippi Rules of Evidence, "[r]elevant evidence is admissible[,] . . .

[and] [i]rrelevant evidence is not admissible." Mississippi Rule of Evidence 401 defines relevant evidence as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the case."

¶70. Mississippi Rule of Evidence 616 allows evidence to show a witness's bias, stating, "Evidence of a witness's bias, prejudice, or interest—for or against any party—is admissible to attack the witness's credibility." However, "[t]he general rule of admissibility of evidence under Rule 616 is subject to the trial judge finding, in his exercise of discretion under M.R.E. 104, that evidence is relevant, under M.R.E. 401 and 402, to the specific facts of the case." *Johnson v. State*, 756 So. 2d 4, 7 (¶7) (Miss. Ct. App. 1999) (citing *Tillis v. State*, 661 So. 2d 1139, 1142 (Miss. 1995)).

¶71. In this case, we agree with the circuit court that the sexually explicit photographs and video that Leslie sent to Michael were not relevant to the facts of this case. Although Chamblee claims that his defense was Leslie's bias against him, he failed to present proof that Leslie's alleged bias led her to actions that resulted in the charges against Chamblee. Much of Leslie's testimony about Chamblee was positive, including his healthy relationship with all three of her children and her and Chamblee's intent for him to adopt them. Chamblee presented no proof that Leslie harbored ill will against him, even when she discovered his infidelity. Most importantly, however, neither Melanie nor Maggie testified that their mother had encouraged them to accuse Chamblee of sexual abuse.

¶72. Nor could testimony from Michael establish Leslie's alleged bias. In the proffer, Michael explicitly testified that Leslie did not ask for his help in either getting a divorce from

39

Chamblee or in getting Chamblee convicted. He stated that she only asked him questions about the case and that he did not know why she sent him the photographs and video. Moreover, at the end of the proffer, the court allowed Chamblee to ask Michael if Leslie asked him for help on her case, but Chamblee chose not to put that question to Michael before the jury.

¶73. Chamblee argues that the court's exclusion of the photos and video denied him his due process right to confront the witnesses against him, citing *Ambrose v. State*, 254 So. 3d 77 (Miss. 2018). In *Ambrose*, an uncharged co-participant in a murder cooperated with the State and testified against the defendant, Ambrose. *Id*. at 98 (¶41). The trial court prohibited Ambrose from questioning the co-participant witness about the witness's past criminal history that included a prior non-adjudicated burglary for which he was on probation. *Id*. at 99 (¶44). Ambrose could also not question the witness about whether his plea bargain, which included his testifying against Ambrose, included an agreement that the State would not revoke the witness's probation. *Id*. On appeal, the Mississippi Supreme Court reversed the trial court's ruling, pointing out that the witness was still subject to prosecution throughout the trial, and Ambrose was deprived of the opportunity to fully challenge the witness's credibility. *Id*. at 104 (¶67).

¶74. *Ambrose* is clearly distinguishable from the case at hand. Here, unlike Ambrose, Chamblee was allowed to question Leslie, whose credibility Chamblee said he challenged, about the sexually explicit photographs and video. She admitted to producing them and sending them to Michael "for his birthday." During his proffer, Michael testified to receiving

40

them, but he stated that she never offered him sex in return for help in any case. Neither Leslie nor Michael disagreed with the contents of the photographs or the videotape. There was simply no need for them to be entered into the record. Accordingly, we find no error by the circuit court in excluding them from evidence.

### V. Whether the verdict was contrary to the weight of the evidence.

¶75. Chamblee's final argument is that the guilty verdict on Count I, lustful gratification by touching Maggie, was contrary to the weight of the evidence. This issue also lacks merit because Maggie's testimony, which was both credible and uncontradicted, supports the verdict.

¶76. In a challenge to the weight of the evidence to support a jury verdict, "this Court must, with respect to each element of the offense, consider all of the evidence—not just the evidence which supports the case for the prosecution—in the light most favorable to the verdict. *Price v. State*, 898 So. 2d 641, 650-51 (¶21) (Miss. 2005). Credible evidence that is consistent with guilt must be accepted as true. *Id.* The prosecution is given the benefit of all favorable inferences, and matters regarding weight and credibility of the evidence are to be resolved by the jury. *Id.*

¶77. In this case, the jury found Chamblee guilty of Count II, the allegations concerning Maggie. She testified quite specifically and credibly about the numerous instances of play-fighting that resulted in Chamblee rubbing his private part against her. She explained that he intentionally made her spread her legs, and she could feel him. In addition to numerous instances of this happening, she also testified to Chamblee's touching her breast in the

41

laundry room. Although there was no one else present to witness these actions, there was no proof contradicting them either. We have held that even uncorroborated testimony of a sex-crime victim is sufficient to support a guilty verdict if that evidence if not discredited or otherwise contradicted by other credible evidence. *Barksdale v. State*, 176 So. 3d 108, 112 (¶21) (Miss. Ct. App. 2015).

¶78. Chamblee argues that there was no skin-to-skin contact and that the touching in this case did not establish a "prurient" purpose. Mississippi Code Annotated section 97-5-23(1) does not require skin-to-skin contact; it prohibits touching or rubbing with his hands or any part of the body, any child under the age of sixteen.[17] The defendant in *Ladnier v. State*, 878 So. 2d 926, 929 (¶10) (Miss. 2004), raised much of the same argument that Chamblee does here, i.e., "that there was no evidence that he touched [his thirteen-year-old victim] for the purpose of indulging his depraved licentious sexual desire and that there was no testimony which corroborated that the touching was anything more than accidental." Citing *Bradford v. State*, 736 So. 2d 464 (Miss. Ct. App. 1999), the Mississippi Supreme Court noted:

> The court found no case law which stated what was necessary to give rise to an inference that an undisputed act of touching was for the purpose of satisfying a defendant's sexual desires, but that there must be some probative evidence as to the purpose of the touching. The court held that evidence that

---

[17] Mississippi Code Annotated section 97-5-23(1) reads:

(1) Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, or with any object, any child under the age of sixteen (16) years, with or without the child's consent, or a mentally defective, mentally incapacitated or physically helpless person as defined in Section 97-3-97, shall be guilty of a felony.

the touching was for purposes of satisfying lustful desires could arise from a description of the circumstances of the encounter itself:

> For example, touching in inappropriate parts of the child's body, overly demonstrative acts of affection, events occurring when the child is not fully clothed, or some evidence of sexual arousal by the defendant during the encounter, might be sufficient to draw a reasonable inference as to the improper purpose of the defendant's act.

*Ladnier*, 878 So. 2d at 930 (¶12). In the case at hand, Maggie testified that she felt that Chamblee's actions were sexual. When she tried to close her legs, he made her spread them open. She could feel his penis as he moved up and down, sometimes for as long as twenty minutes. Certainly, when viewing the evidence in a light most favorable to the verdict, a jury could find from this testimony that the touching, even though both were clothed, indicated the improper purpose of gratification of lust. Accordingly, we find that the verdict is not so contrary to the weight of the evidence and the inferences that can be drawn from it such that affirming the jury's verdict of guilty on Count II would sanction an unconscionable injustice.

**Conclusion**

¶79. Although Chamblee properly filed a motion for change of venue, the presumption that arose was rebutted by the State's witnesses and by the seating of an impartial jury. Further, despite the inappropriate conduct of the witness's grandfather's gesturing from the audience while she was testifying, Chamblee failed to establish that he was irreparably prejudiced and entitled to a mistrial. We further find no reversible error in the circuit court's evidentiary rulings excluding testimony of allegedly false accusations made in 2015 and concerning alleged abuse of M.J., as well as the exclusion of sexually explicit photographs and videos

43

by the victims' mother.  Finally, we find the jury verdict of guilty of Count II was not against the overwhelming weight of the evidence.  Finding no error, we affirm the circuit court's rulings and the judgment of conviction and sentencing upon the jury's guilty verdict in this case.

¶80.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**